## STEUSOFF et al. v. LIBERTY COUNTY.
### No. 1295.

Court of Civil Appeals of Texas. Beaumont. Oct. 30, 1930.

Rehearing Denied Jan. 7, 1931.

644

E. B. Pickett, Jr., of Liberty, for appellants.

W. N. Foster, of Conroe, and P. C. Matthews, of Liberty, for appellee.

WALKER, J.

In 1916 C. S. Steusoff was duly elected tax assessor of Liberty county, and on the 15th of December of that year duly qualified as such with W. B. Green, Joseph Riviere, and H. A. Ager as his official sureties. He was re-elected to this office in 1918, and whether or not he qualified as required by law for this second term was a question of fact. As tried, this suit was by Liberty county in its own right, and for the use and benefit of its road districts 1, 3, 4, and 5, and its drainage districts 1 and 2, against Steusoff and his official bondsmen to recover certain overpayments made by the commissioners' court to Steusoff for assessing taxes for the years 1917, 1918, 1919, and 1920, and for certain excess fees unlawfully retained by Steusoff during these years. The amount so claimed by Liberty county in its petition was as follows:

| Overpayments | 1917 | $2,677.68 |
|---|---|---|
| | 1918 | 2,493.58 |
| | 1919 | 940.83 |
| | 1920 | 2,114.76 |
| making a total of | | $8,226.85 |
| Excess fees | 1917 | 738.08 |
| | 1918 | 870.18 |
| | 1919 | 1,090.39 |
| | 1920 | 1,197.79 |
| making a total of | | $3,896.44 |

Upon an instructed verdict, judgment was entered against Steusoff for $11,500.59 and against his sureties for $5,000; that being the penal sum fixed by law for Steusoff's bond as tax assessor. The judgment did not apportion the recovery among the different plaintiffs. Certain of the sureties having died since the execution of the bond, their heirs were made parties defendant and judgment entered against them as such. Upon the concessions of appellee, $8,226.80 of this judgment was for overpayments, and the balance, $3,273.74, was for excess fees. On the allegations of the petition appellee designated as overpayments the amounts ordered paid to Steusoff above the actual earnings of his office. Having alleged that Liberty county was under the provisions of the maximum fee bill, appellee charged against him as excess fees the difference between the sums he was yearly entitled to under the statute and the actual earnings of the office.

Steusoff's first proposition is that the overpayments made to him under the orders and judgments of the commissioners' court were made judicially by the court in the regular discharge of its duties and within its jurisdiction; and that such orders, being so made, constituted and were final judgments of a court of general jurisdiction, from which no appeal was prosecuted; and that such orders were therefore not subject to collateral attack. All parties concede that the attack made upon these orders by this proceeding is collateral. Without detailing the facts surrounding the entry of the several orders under which the overpayments sued for were made to Steusoff, we simply say that they were final judgments of the court, possessing every element of a final judgment, provided the court had jurisdiction to enter them.

The following facts explain most of the overpayments: When Steusoff entered upon the discharge of the duties of his office in 1916, he designated T. O. Brown as his official deputy. This appointment was presented to and canvassed by the commissioners' court and approved by the court, but without the formal entry of an order in its minutes

to that effect. As such deputy, the commissioners' court allowed Brown the following advance payments, during the four years he was deputy, and warrants were ordered issued for these payments, which warrants were in fact issued and delivered to Brown and cashed by him, to wit: For 1917, beginning on the 15th of February and ending on the 5th day of September, $1,700; for 1918, beginning on the 1st day of January and ending on the 23d day of August, $1,500; for 1919, beginning on the 24th day of February and ending on the 30th day of October, $1,800; for 1920, beginning on the 12th day of February and ending on the 20th day of November, $1,850; totaling $6,850. These sums were paid to Brown by various warrants issued at various times between the dates above given, ranging in amounts from $100 to $350. In presenting his yearly accounts for audit and settlement, Steusoff failed to report these advance payments, and in the final audit was, for that reason, not charged with any of them. For each of the four years involved in this suit Steusoff presented his annual accounts for audit long after his annual tax rolls had been approved and after the yearly advancements had been made to deputy Brown. The orders allowing Brown's advancements were of record in the minutes of the court.

■ The question is simply whether the commissioners' court, with both actual and constructive notice of the amount of taxable property reflected by the tax rolls and of the advancements made to deputy Brown, had jurisdiction to order payments made to Steusoff in excess of the actual earnings of his office. It is not necessary to discuss the principles of law by which the judgments and orders of commissioners' courts must be construed, for we understand that all parties agree that their orders regularly made within their jurisdiction are not subject to collateral attack, but that orders made beyond their jurisdiction are absolutely void, where the want of jurisdiction appears upon the face of the record of the particular matters in controversy. In this case Steusoff's accounts were presented and audited under the provisions of article 3937, R. S. 1925, which fixes with certainty the percentages to be paid the tax assessors of this state, to be calculated upon the face of the tax rolls. The court was without jurisdiction to allow a different compensation from that fixed by this article. Cameron County v. Fox, 2 S.W.(2d) 433, by the Commission of Appeals, directly supports the proposition that the tax rolls of Liberty county, having been approved by the court prior to the presentation by Steusoff of his annual accounts, were as much a part of his accounts as if he had copied them literally therein. Therefore, since the record made by him for the audit and allowance of his accounts showed affirmatively the exact amount of compensation earned by his office, the commissioners' court was without jurisdiction to allow a greater sum than reflected by the record. This is so because, knowing the amount of the taxable property, the commissioners' court could allow an overpayment only by allowing an excess percentage, which would be beyond its jurisdiction.

■ The warrants issued to Brown as deputy have support in the following provisions of the above-cited article:

"The commissioners' court shall allow the assessor of taxes such sums of money to be paid monthly from the county treasury, as may be necessary to pay for clerical work, taking assessments and making out the tax rolls of the county, such sums so allowed to be deducted from the amount allowed to the assessor as compensation upon the completion of said tax rolls; provided the amount allowed the assessor by the commissioners' court shall not exceed the compensation that may be due by the county to him for assessing."

Under this statute the commissioners' court was without jurisdiction to audit Steusoff's accounts except by charging him with the advance payments; that is to say, having both actual and constructive knowledge of these advance payments which were, as a matter of law, a part of Steusoff's annual accounts, as much so as if copied therein by him, the court had no jurisdiction to audit his accounts without charging him with these advance payments.

■ The conclusion follows that the judgments and orders approving Steusoff's accounts for sums in excess of the actual earnings of his office are absolutely void, and therefore subject to collateral attack in this proceeding.

■ All overpayments for the years 1917 and 1918 were made more than two years prior to the filing of this suit, but the overpayments for 1919 and 1920 were made within the two years. As an alternative defense, Steusoff pleaded the statute of two years' limitation (Rev. St. 1925, art. 5526) against the overpayments in 1917 and 1918.

Grayson County v. Cooper (Tex. Civ. App.) 211 S. W. 249, being absolutely on all fours with the facts of this case with respect to the payments for 1917 and 1918, supports appellant's proposition that the overpayments for these two years were barred by limitation. While the Cooper Case was not carried to the Supreme Court, it was subsequently cited with approval by Judge Barcus of the Waco Court of Civil Appeals in McKenzie v. Hill County, 263 S. W. 1073. Recognizing the force of this authority, appellee insists that it was in effect overruled by the Supreme Court in Nichols v. Galveston County, 111 Tex. 50, 228 S. W. 547. We do not give the Nichols Case that construction. The Cooper

Case involved a suit for money voluntarily paid by the county to its tax assessor in excess of the fees and commissions earned by the office. It was there held that the action was one simply for money had and received, voluntarily paid by the county to its tax assessor, and therefore within the statute of two years' limitation. In the Nichols Case the action was against the tax assessor for his failure to account for the excess fees earned by his office. Such excess fees were "protected by his bond and therefore not within the statute of two years."

■ We sustain the contention of the sureties that they were not liable for any of the overpayments made to Steusoff by the commissioners' court. As that court was without jurisdiction to order the payments, such payments were not received by Steusoff officially, and therefore not within the conditions of his bond. Jeff Davis County v. Davis (Tex. Civ. App.) 192 S. W. 291 (writ of error denied by the Supreme Court), directly supports this conclusion.

■ On authority of Stevens County v. Hefner (Tex. Com. App.) 16 S.W.(2d) 804 (on original submission the decision of this case was postponed to await the decision of the Supreme Court in the Hefner Case), we understand that appellee concedes that Liberty county was not under the maximum fee bill for the years 1917, 1918, and until the 18th of June, 1919. Steusoff confesses liability for the excess fees for 1920, but insists that, since all the work in preparing the tax rolls for 1919 had been completed before the law went into effect, putting Liberty county under the provisions of the maximum fee bill, he should not be charged with any excess fees for that year. We overrule this contention. When the present Chief Justice of the Supreme Court was Attorney General, his department gave the following opinion upon this proposition:

"It is the opinion of this Department, and you are so advised, that the officers mentioned in Articles 3881 to 3886 in those counties which have a population of less than twenty-five thousand, according to the last U. S. census, should make their report for that portion of the year from June 18 to November 30, inclusive, 1919. The report should have been filed on December 1, 1919. The report should be only for that portion of the year as remained after the law became effective. The officers in making this report should be governed by the general provisions of Chapter 4, Title 58, of the Revised Civil Statutes, and should retain such proportional part of the maximum fees allowed as the time from June 18 to November 30, inclusive, bears to the entire year."

On this basis Steusoff was entitled under the old law to 54.8 per cent. of all excess fees earned by him for the year 1919, but was liable to the county for three-fourths of 41.2 per cent. of the excess fees earned for that year.

■ Appellee sued the sureties on Steusoff's 1916 bond for the excess fees due by him for the years 1919 and 1920, as well as for the years 1917 and 1918, on the theory that he did not regularly qualify after his 1918 election, but held his office for all the four years under his 1916 qualification. The trial court sustained appellee's theory and rendered judgment against the sureties for all excess fees.

The sureties are in error in their contention that they were, as a matter of law, released from their bond whether Steusoff requalified or not. No authority from this state directly in point has been cited, but we think the proposition is controlled by the Constitution. Section 14 of article 8 reads as follows:

"There shall be elected by the qualified electors of each county, at the same time and under the same law regulating the election of state and county officers, an assessor of taxes, who shall hold his office for two years and until his successor is elected and qualified."

Section 17 of article 16 reads as follows:

"All officers within this state shall continue to perform the duties of their offices until their successors shall be duly qualified."

Under these constitutional provisions the tax assessor was required to hold his office for two years and until his successor was elected and qualified and to perform the duties of his office until his successor duly qualified. From these constitutional provisions we think it must follow that the sureties were bound by the conditions of their bond as long as Steusoff held his office under the terms of the Constitution. For a general discussion of this proposition, see 46 C. J. 1073.

■ But we sustain the further proposition of the sureties to the effect that they raised the issue of due qualification by Steusoff in the fall of 1918. On this issue we quote as follows from appellant's brief, summarizing the facts:

"In support of appellants' plea that Steusoff executed and the commissioners' court approved a bond given by Steusoff to the county as county assessor after his reelection in November, 1918, Steusoff testified:

"'This is what I recall about having one or two bonds after my election in November, 1918: I am very positive of having the bond signed by Mr. Harrison, Mr. Ager and Mr. O'Brien in 1918. I am positive of having two bonds signed. I made one bond for the State and one bond for the County. The same sureties signed both bonds. After having those sureties sign those two bonds, I

gave the bonds to the commissioners' court. I do not remember to whom or to any particular person or individual I delivered them. C. N. Smith was county judge. I was not present when the commissioners' court acted on any of the bonds given by the several county officers that year. I wasn't present when they acted on the minutes. After I handed it to Judge C. N. Smith, or whatever official I handed it to, I left.'

"And on cross examination Steusoff's testimony further was:

" 'I am not positive who I took those bonds to. I don't know, but I think it was given to Judge Smith. I do not know whether the court ever examined and acted upon that bond or not of my own knowledge. I was not present when the court considered the matter of approval or disapproval of the various and sundry official bonds of the county officers. I do not know to this day whether they acted upon and approved or acted upon and rejected my county bond that year. I only know they didn't require me to give another bond. It seems that my state bond was acted upon and approved.'

" 'I also went to Mr. H. O. Ager and asked him about the matter, whether he signed one or two bonds. Mr. Ager is dead now. I think he said he didn't know whether he signed one or two bonds, but whatever I gave him to sign he signed it. He said he didn't remember whether there were one or two bonds."

"Upon the same issue D. J. Harrison, after examining the official bond given by Steusoff to the Governor of Texas on December 10th, 1918, and signed by Harrison, Ager and O'Brien as sureties, testified:

" 'I signed several bonds for Mr. Steusoff as tax assessor, but I cannot be positive, absolutely positive that I signed two bonds at the time he brought to me the above mentioned bond. I will say, however, that to the best of my recollection I signed two instruments at that time. The date of the bond, which identifies the time when I signed that one bond, is December 10th, 1918.'

"And on cross examination, he said:

" 'As a matter of fact I cannot say whether I was requested to sign two bonds for Mr. Steusoff at that time or not; that is, I cannot say it positively. I know that Mr. Steusoff was a friend of mine, in whom I had confidence, and that I would have signed it if he had requested me to; that is about all I know about it. I know I would have signed it. I didn't think there was any liability on it. If he sent it to me, I signed it; if he presented one, I signed it; I am not positive about it. My recollection is I signed two instruments here that day.'

"C. N. Smith, who was county judge at the time, testified:

" 'Following the general election in November, 1918, the various and sundry officials who had been elected to office qualified by filing bonds with the commissioners' court. I could not state whether, following the November election, 1918, about the time the officers qualified, the defendant Steusoff handed me a county bond, a bond as county tax assessor, other than what the records might show. My practice was, when a county official handed me a bond, to keep them until they were approved, and then delivered them to the clerk. I uniformly—every time—delivered bonds that had been acted upon by the commissioners' court to the county clerk. Had there been a bond delivered to me by Mr. Steusoff at or about that time, I would have had the commissioners' court act on it and I would have then delivered it to the clerk.'

"The official bond executed by Steusoff to to the Governor of Texas, with Harrison, Ager and O'Brien as sureties thereon, is dated December 10th, 1918, and was approved by the commissioners' court on that same date. A commissioners' court order appearing in Vol. 8, page 376, of the docket of said court reads:

" 'Be it remembered that on this the 9th day of December, A. D. 1918, this commissioners' court met in regular session, with all members present as follows', the names of the county judge and the four commissioners being stated. And then on page 280 of the same docket appears this entry: 'It is ordered by the court that the following bonds be approved: T. J. Handley, as constable, precinct No. 6; S. S. Richardson, as constable, precinct No. 2; Mrs. D. R. Lilley, as County Treasurer; C. F. Steusoff, as Tax Assessor; R. W. Franklow, as J. P., Precinct No. 7'. There is no date given as forming a part of this entry. Also this entry was offered in evidence: 'December 2, 1918. Commissioners' Court reconvened on this date for the purpose of approving official bonds, all members of the court being present as follows: (naming the county judge and four commissioners), the following bonds are ordered approved. It is ordered by the court that the following bonds be approved: D. H. Handley as constable precinct No. 6' (and several others intervening) and then 'C. F. Steusoff as tax assessor.' And referring to that order C. N. Smith testified:

" 'I cannot say from that entry how many bonds of C. F. Steusoff were before the court. The wording of the order would have been the same had there been one bond or two.'

"It will be observed that the date of the above entry, showing that a bond or bonds of C. F. Steusoff as tax assessor were approved by the commissioners' court, is December 2nd, 1918, and we have seen that the State bond which Steusoff and his sureties executed and the court approved is dated December 10th, 1918. Also there was an entry tending to indicate that some bond of Steusoff as tax assessor was approved December 9, 1918."

■ It appears from the foregoing statement that Steusoff himself says he executed both bonds and delivered them to the commissioners' court; that is, to the county judge for the use of the commissioners' court. In this he is strongly corroborated by Mr. Harrison; one of the sureties on his bond to the state. While the bond to the county is not identified in any formal order approving the same, the minutes of the commissioners' court recite the approval of a bond as of date the 9th of December, 1918, while there is a similar recitation in the minutes of date December 2, 1918. Appellee insists that this evidence was without probative force, because there was no proof as to the conditions of the bond Steusoff says he delivered to the commissioners' court the names of the sureties, etc. These objections are overruled. If in fact Steusoff's bond was approved, the sureties on the first bond were relieved of all liability. The orders of the commissioners' court, even though made verbally, approving and accepting the bond of the new officer or of an old officer for a new term releases the sureties on the preceding bond, provided he has taken the required oath. So on this proposition the conditions of the bond and the names of the sureties are immaterial. The issue was whether Steusoff presented a bond to the commissioners' court for its approval which the commissioners' court regularly approved.

■ The bond sued upon, executed in 1916, was for the penal sum of $10,000. The penalty fixed by the statute was only $5,000. Appellants objected to the admission in evidence of this bond on the ground that the excess penal sum rendered it void. (Rev. St. 1925, art. 7178.) There is no suggestion in the evidence that the commissioners' court compelled Steusoff to make a bond in the penal sum of $10,000, but the record is clear that he voluntarily tendered a bond in that sum. On the record it should be said that Steusoff tendered this bond to the commissioners' court in his efforts to qualify for the discharge of the duties of his office, voluntarily fixing the penal sum at $10,000. On authority of Meador v. Adams, 33 Tex. Civ. App. 167, 76 S. W. 238, 239, this excess penal sum did not render the bond void. It was there said:

"It sometimes occurs that a bond prescribed by a statute, and required by it to be taken by a specified officer, is so drawn that it contains conditions in excess of those specified by the statute. In such a case the question arises whether the bond is valid at all, and, if so, to what extent. The law in such case seems to be settled that, if such a bond be voluntarily executed by its obligors, it is valid so far as it imposes obligations authorized by the statute, but the stipulations which are in excess of it may be rejected as surplusage. If the penalty of a bond voluntarily given be larger than that prescribed by the statute, the bond is not void for that reason. It is valid to the amount of the statutory penalty, and void only as to the excess."

■ While appellants excepted to the refusal of the court to sustain their exceptions against the right of Liberty county to prosecute this suit for the use and benefit of the road districts, we understand this exception has been withdrawn. On authority of American Surety Company v. Hill County (Tex. Civ. App.) 254 S. W. 241, 245, Liberty county had the right to prosecute this suit for the use and benefit of its road districts.

■ Appellants also reserved exceptions in the lower court, and have duly prosecuted the same to this court, against the ruling sustaining the right of Liberty county to prosecute this suit for the use and benefit of the drainage districts. We think Watson v. El Paso County (Tex. Civ. App.) 202 S. W. 126, is interestingly in point sustaining the ruling of the lower court on this proposition. In this case the commissioners' court could and did direct that warrants issue to Steusoff out of the funds of the drainage districts in payment of his fees as tax assessor. Having that control over these funds, certainly it should have the power to sue to correct a mistake made by it in the discharge of this duty.

■ Under the maximum fee bill that went into effect on June 18, 1919, Steusoff was entitled to retain for his own compensation the sum of $2,240 per year, and for a deputy duly confirmed by the commissioners' court the sum of $1,200 per year. All sums earned by his office in excess of these two amounts he was required by law to pay into the treasury of Liberty county as excess fees. The trial court, in rendering judgment against him herein, did not allow him any credit for the advancements regularly made to Deputy Brown. In support of this judgment, appellee advances the following counter proposition:

"In applying the maximum fee law in rendering judgment the court properly failed and refused to allow defendant Steusoff anything for deputy hire, because neither the pleading nor the proof would justify any such allowance. It does not appear from anything in defendant Steusoff's pleading that he ever complied with article 3903 of the maximum fee law, or said article as amended in 1917 (Vernon's Sayles' Civil Statutes of 1914; Vernon's supplement of 1918) and it was, therefore, not made to appear by said defendant's pleading (nor was it made to appear by the proof) that the defendant was entitled to have a deputy whose compensation was payable out of the fees of the office."

■ As we understand appellee's petition, it invokes all the provisions of the maxi-

mum fee bill, and, having pleaded this law, draws the conclusion that Steusoff was due the county certain excess fees. The general denial filed by appellant was sufficient to support the defense that he did not owe the excess fees sued for. Horton & Horton v. House (Tex. Com. App.) 29 S.W.(2d) 984. Under the general denial, appellant had the right to offer testimony that Brown had been regularly appointed deputy, and that advancements or salary had been regularly paid him under orders which in substance complied with the statute. In selecting Brown as his deputy and certifying his selection to the commissioners' court, it is admitted that Steusoff did not comply with the requirements of the statute. It is also admitted that the commissioners' court did not make a formal order ratifying his appointment. But it is our conclusion that the law was substantially complied with. The conditions of Brown's employment by the commissioners' court and the relation of the commissioners' court thereto and the manner in which his salary was paid him is thus reflected by Mr. Brown's testimony:

"During the years 1917, 1918, 1919 and 1920, as shown by the record, and as shown on the docket of claims allowed by the commissioners' court, were issued to me in my capacity as Deputy Tax Assessor. Sometimes they were made out possibly for assessing taxes or as deputy assessor. I don't remember just how they were made out, whether for the same thing all the time but that is what they were intended for. In each instance I applied for and drew those warrants in my capacity as deputy assessor. I believe on one occasion Mr. Steusoff wrote an order on the commissioners' court, asking them to advance money, but as a rule I just went in there and asked for it, and the commissioners' court understood it. These warrants were issued to me as advances to the deputy tax assessor. Mr. Steusoff authorized me to draw advances as I needed it, and in pursuance of that authority I got these advances. It was understood when I first went into the office that I was to get only $1,200.00 and I refused. My agreement with the commissioners' court was that they would allow us two percent on special rolls; if that was done, they would give me $1,500.00 a year as deputy assessor. That agreement was made between myself and the commissioners' court. It was the first year that Mr. Steusoff was elected that the commissioners' court agreed to pay me $1,500.00 a year salary. That agreement was made when I started to work on the taxes, after I finished the assessments. The agreement was to apply that year. The agreement was never changed after that that I know anything about. These payments that the record here shows were made to me as deputy tax assessor were in fact paid to me. The most of the time the money so drawn was appropriated by me. All of those payments were made to me by virtue of my being deputy tax assessor. Those advances were made directly by an understanding between me and Mr. Steusoff that I would be paid for deputy hire in that way. I stated that in some instances I got an order from Mr. Steusoff. As I would get these checks or warrants I would myself take them to the treasurer or bank them for cash. I did that in every instance."

On this testimony we conclude that Mr. Brown was in fact the official deputy of Mr. Steusoff from the time of his original appointment in 1917 up to and through 1920, and entitled to the statutory salary under the maximum fee bill to be paid him from the fees earned by Steusoff's office. The amount paid Mr. Brown over the statutory salary of $1,200 should be charged against Mr. Steusoff, and should have been deducted by the commissioners' court from his salary of $2,250 fixed by the statute; that is to say, notwithstanding the commissioners' court for 1919 and 1920 paid Brown more than the $1,200, all Steusoff could retain lawfully from the fees of his office from June 18, 1919, to the end of that term was his own salary of $2,250 per year and the statutory salary of his deputy Brown in the sum of $1,200.00 per year. All sums in excess of these two amounts were due by him to the county, and should have been paid by him into the county treasury, and, not having done so, Liberty county is entitled in this action to judgment therefor.

Measuring appellee's recovery by the foregoing propositions of law, from the admitted facts as we understand them, Steusoff's office earned for the year 1919 $3,703.85. He was entitled to all fees earned up to June 18, 1919. Under the formula approved by the Attorney General, as quoted above, for dividing the excess fees for that year, Steusoff was required to account for, that is, pay into the county treasury, only three-fourths of the excess fees earned subsequent to June 18th, which, as calculated by appellant, whose figures we adopt, amounted to $86.06. For 1920 his office earned $3,847.05, which should be credited with the salary due him and his deputy in the sum of $3,450, leaving an excess of $397.05. Of this sum it was his duty to pay into the county treasury three-fourths thereof, that is, $297.79, making a total of excess fees in the sum of $383.85 due the county by Steusoff. On this issue the judgment of the lower court in favor of appellee is reformed and here rendered in favor of Liberty county against Steusoff in the sum just named. Under our foregoing conclusions, this is the only sum for which, in any event, Steusoff's sureties could be held liable by the judgment. It is our conclusion, as above stated, that the court erred in refusing to submit to the jury the issue of due qualification by Steusoff in 1918. Therefore the judgment against the sureties must be reversed and remanded for

650

a new trial on this issue. If it is found that Steusoff duly qualified in 1918, then no judgment should be rendered against the sureties, but, if he did not duly qualify, then the judgment against the sureties should be in the sum named. The reversal and remand of this case is limited to this single issue.

■ Appellee not only sued Steusoff and his bondsmen but the members of the commissioners' court, including the county judge, and their bondsmen. The trial court, upon exceptions of appellants, held that the joinder of these different defendants constituted a misjoinder of parties and a misjoinder of causes of action. The members of the commissioners' court, including the county judge, also raised these issues by their exceptions and answers. The lower court sustained these exceptions, as presented by the several defendants, and required appellee to elect which group of defendants it desired to sue. Appellee, reserving its exceptions, filed an amended petition suing Steusoff and his bondsmen and eliminating the county judge and the other members of the commissioners' court. Appellee reserved exceptions only to the ruling of the court sustaining the exceptions of Liberty county. No exception whatever was reserved against the ruling sustaining the exceptions of the county judge and the members of the commissioners' court; at least no cross-assignment was filed against that ruling. As a matter of practice, it is our conclusion that appellee should have reserved and protected its rights as against the county judge and the members of the commissioners' court. They should have their day in court on the issues raised by their exceptions. As appellee has cross-assigned no error against *them*, the judgment in their favor must be affirmed.

■ The calculation of the amount of overpayments made to Steusoff for 1919 and 1920, being the amounts not barred by limitation, is one of great difficulty. Appellants suggest two or three methods of making this calculation, and appellee suggests different methods for the same calculations. From a study of the different tables presented by the parties and of their contentions, it is our conclusion that the overpayments should be calculated upon the following basis, to wit: Steusoff received for 1919 $4,895.64, and for 1920 $6,229.06. These amounts should each be credited with the sum of $3,450, the amount Steusoff was entitled to retain for the use of himself and his deputy, the amount of the excess fees earned by his office each year, and the commissions allowed him each year for assessing the taxes of common school districts, liberty independent school district, and Liberty improvement district No. 1, which amounts were not sued for by appellee. Allowing these credits, we find that Liberty county is entitled to recover against Steusoff overpayments for 1919 in the sum of $717.75 and for 1920 in the sum of $1,845.39. It is our further order that interest be calculated upon both the excess fees and the overpayments from the dates these sums were due by Steusoff to the county, and should judgment be rendered against the sureties upon another trial for excess fees that interest in like manner be charged against them.

■ The trial court did not err in receiving in evidence against the children of one of the deceased bondsmen the tax rolls of Liberty county. This was offered by the appellee to prove the value and character of the estate of the deceased surety. His children, who had been made defendants on the theory that they had received valuable property from the estate, objected only on the grounds that the evidence was irrelevant, immaterial, and secondary. When offered, this evidence was admissible as a circumstance to support the theories upon which it was offered. Whether or not appellee followed up the introduction of this testimony by raising the issue that it passed into the hands of these defendants and its value in their hands presents a question not before us.

It follows that the judgment of the trial court is in part reformed and affirmed, and in part reversed and rendered, and in part reversed and remanded, and in part affirmed.